## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TWIN CITY FIRE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-1065-JES-JEH |
| | ) | |
| ALCAST COMPANY, BRIAN HOLT, and STEPHEN WESSELS, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

## <u>ORDER AND OPINION</u>

This matter is now before the Court on Plaintiff's Motion (Doc. 63) for Partial Summary Judgment, Defendant Alcast's combined Response (Doc. 71) thereto and Request for Summary Judgment, and Plaintiff's combined Reply and Response (Doc. 77). For the reasons set forth below, Plaintiff's Motion (Doc. 63) is denied and Defendant's Request for Summary Judgment is denied.

### BACKGROUND[1]

**The Parties**

Twin City Fire Insurance Company (Twin City) is an insurance company formed under the laws of Indiana with its principal place of business in Connecticut. Doc. 1. at 3. Alcast Company (Alcast) is an Illinois corporation; Brian Holt (Holt) is an officer of Alcast; Stephen Wessels (Wessels) is the President of Alcast. Holt and Wessels are both Illinois citizens. Doc. 1 at 1–3.

---

[1] The following facts are undisputed by the parties unless otherwise noted.

**The Policy**

Twin City issued a Private Choice Premier Policy to Alcast, Policy Number 36 KB

0296823-19, effective from June 30, 2019 to June 30, 2020 (the Policy). The Insuring Agreement

C (as to Alcast) in the Twin City Policy provides:

> If Entity Liability Coverage is included in ITEM 5 of the Declarations, the Insurer shall pay Loss on behalf of an Insured Entity resulting from an Entity Claim first made against such Insured Entity during the Policy Period or Extended Reporting Period, if applicable, for a Wrongful Act by an Insured Entity.

Doc. 63 at 2. The Policy defines "Loss" to include "Defense Costs" and "Damages," with

"Defense Costs" defined as "reasonable legal fees and expenses incurred in the defense or appeal

of a Claim…[h]owever, Defense Costs shall not include any fees, expenses or costs which are

incurred by or on behalf of a party which is not a covered Insured[.]" *Id*. at 2–3.

The Policy also contains an Allocation Provision, which provides:

> Solely with respect to all Liability Coverage Parts:

> Where Insureds who are afforded coverage for a Claim incur an amount consisting of both Loss that is covered by this Policy and also loss that is not covered by this Policy such Claim includes both covered and uncovered matters, then coverage shall apply as follows:

> (A) with respect to a covered Claim for which the Insurer has the duty to defend:

>> (1) 100% of the Insured's Defense Costs shall be allocated to covered Loss; and

>> (2) All other Loss shall be allocated between covered Loss and non-covered loss based upon the relative legal exposure of all parties to such matters.

> (B) with respect to a covered Claim for which the Insurer does not have the duty to defend, all Loss shall be allocated between covered Loss and non-covered loss based upon the relative legal exposure of the parties to all such matters.

Doc. 63 at 4; Doc. 77 at 4.

**The Underlying Litigation**

On November 4, 2019, Sarah L. Little, the Trustee of the bankruptcy estate of Pacific Steel Casting Company LLC (Pacific Steel or Debtor) filed a Complaint in the Adversary Proceeding against 14 defendants, including Alcast, Holt, and Wessels, asserting a host of claims: illegal distributions, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, equitable subordination, avoidance of fraudulent and/or preferential transfers, recovery of avoided transfers, declaratory relief, and claim disallowance. *Id*. at 3. Thereafter, the Trustee filed a First Amended Complaint (FAC), which is presently the operative pleading in that litigation. Doc. 63 at 3.[2]

On January 17, 2020, Jenner & Block (Jenner) entered its appearance to represent 13 of the 14 defendants (i.e., every defendant except for UHY) in the underlying action. Doc. 63 at 4. The underlying action contains 14 causes of action against three "groups" of defendants: (1) the Owner Defendants (Speyside Fund, Alcast, Venkatesan, Stone, Wiklendt, RataxasCo, Speyside Equity, Daugherty, TD Trust, PD Trust, Sylvester, and Stone); (2) the Management Defendants (Venkatesan, Stone, Johnson, Holt, Wessels, and Daughtery); and (3) UHY. *Id*. at 4–5. The FAC names Alcast as part of the Owner Defendants but not as part of the Management Defendants. The Owner Defendants, including Alcast, are named as defendants in the FAC's causes of action 1, 5, 6, 7, 8, 9, 10, 11, and 12. The Owner Defendants are not named as defendants in the FAC's causes of action 2, 3, 4, and 13.

The FAC alleges total damages against all of the defendants of $54,348,177, which is comprised of: (i) $10,748,177 for the Initial Illegal Distribution; (ii) $3,600,000 for the 2018

---

[2] For the sake of clarity, the Court points out that its citations to the record utilize the electronic filing system's document numbers and page numbers. Because Twin City's pagination in its summary judgment motion differs from the Court's ECF pagination, Twin City's pagination is disregarded.

Illegal Distribution; and (iii) "no less than $40,000,000." Twin City asserts the FAC alleges total damages against Alcast of $3,964,968, which is allegedly comprised of: (i) $3,805,718 of the Initial Illegal Distribution; and (ii) $159,250 of the 2018 Illegal Distribution. Doc. 63 at 5. Alcast disputes this statement because the Trustee's 14th claim for relief seeks a minimum of $40,000,000 in damages against the Owner Defendants, which includes Alcast. Thus, in Alcast's view, the total damages alleged against Alcast amount $43,964,968. Doc. 71 at 4. If Twin City's position is correct, the total damages in the FAC sought against Alcast represents 7.295% of the total damages sought against all defendants. If Alcast's position is correct, that number jumps to 80.89%. Doc. 63 at 5; Doc. 71 at 5.

On July 2, 2020, Jenner filed a motion on behalf of six defendants in the underlying action with the United States Bankruptcy Court for the Northern District of California seeking an order confirming that Continental Casualty Company (referred to by the parties as CNA), Speyside's insurer, advance or reimburse defense costs incurred in connection with the underlying action. Although the parties agree as to the above statement, Twin City asserts that Jenner "signed the motion as counsel for thirteen parties, including Alcast." Doc. 63 at 6. Alcast disputes that Jenner's signature block at the end of its motion indicates that Jenner filed the motion on Alcast's behalf. Doc. 71 at 6. On July 20, 2020, the bankruptcy court granted the other underlying defendants' Motion, thereby permitting CNA to pay some of the defense costs incurred by Jenner in the Underlying Lawsuit.

The law firm of Miller Johnson, who represents Alcast (as well as other underlying defendants, who are defended by Jenner), has demanded in a July 31, 2020 letter that CNA pay 100% of the Jenner Invoices, and asserted that CNA's failure to pay 100% of the Jenner invoices is "bad faith":

4

> We don't agree that CNA may allocate defense costs between insured and uninsured defendants. All of the defense costs were incurred in the defense of insured defendants, even if some of those defense costs also inured to the benefit of uninsured defendants. When a complaint alleges claims against both insured and uninsured defendants, an insured must pay all defense costs that are 'reasonably related' to the defense of the insured, even if those defense activities also benefit an uninsured defendant.

> This [allocation] provision confirms that CNA must pay 100% of the insured's reasonable and necessary defense costs, even if a claim includes uncovered parties;

> [W]e do not agree to the allocation of 50% of defense costs to uninsured defendants. Such an allocation is arbitrary, contrary to the policy, and contrary to the law. CNA must pay for 100% of the insured's defense costs, even if some of those defense activities inure to the benefit of an uninsured defendant…CNA's allocation is a breach of its duty to defend, and it is bad faith.

Doc. 16 at 6. Separately, on April 20, 2020, Miller, Hall & Triggs, who also represent Alcast in some capacity, emailed Twin City asserting that Alcast does not agree that defense costs should be prorated. Doc. 63-6. From this, Twin City asserts that Alcast and the other defendants in the underlying action are demanding that the two insurers each pay 100% of the Jenner invoices by asserting identical arguments against both CNA and Twin City. Alcast disputes this, asserting it only seeks payment for 100% of defense costs incurred on Alcast's behalf, and does not seek to recover more than the total amount of Jenner's unpaid invoices. Doc. 71 at 5–6.

To date, CNA has paid $413,179.38 of Jenner's invoices for defense costs incurred by CNA's insured out of a total of $3,933,684.91 invoiced by Jenner. To date, Twin City has advanced $202,824.93 of the Jenner invoices, which the parties argue is between 7.2% and 7.295% of the Jenner invoices presented to Twin City for payment.

**Additional Material Facts**

The Owner Defendants, including Alcast, are named as defendants in the FAC's 14th cause of action.[3] For all "Liability Coverage Parts," the Policy provides that Twin City "shall have the right and duty to defend Claims covered under the Policy." The D&O Coverage Part defines "Claim" to include an "Entity Claim," which is a civil proceeding against Alcast as the "Insured Entity." Alcast elected Entity Liability Coverage under the Policy, for Policy Period June 30, 2019 to June 30, 2020. For Twin City's duty to defend to be triggered, an "Entity Claim" must allege that Alcast committed a "Wrongful Act," which the Policy defines as any actual or alleged "error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed by" Alcast. Twin City has agreed to provide Alcast with a defense in the underlying litigation subject to a reservation of rights regarding its duty to defend. Twin City's policy limit for Entity Liability Coverage is $2,000,000. Doc. 71 at 9–10.

Twin City has also submitted additional material facts in response to Alcast's request for summary judgment. Doc. 77 at 12–17. Each of those additional material facts relate to litigation between the *Pacific Steel* defendants and Speyside Fund's insurer, CNA. As the Court explains below, whether a *Pacific Steel* defendant who is not an insured of Twin City is entitled to some or all defense costs from an insurer other than Twin City is not relevant to the issues presented in this litigation.

---

[3] Twin City attempts to dispute this statement by referencing the *original* complaint in the underlying action and pointing out that cause of action was not present in the *original* complaint. Doc. 77 at 3. So what? The statement at issue was about the *amended* complaint. That is extraneous information irrelevant to the proposition being advanced by Alcast. Any remaining "disputed" responses which do not actually the proposition being advanced will be summarily disregarded. *See e.g.*, *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008) ("Argumentative responses that simultaneously deny the veracity of a defendant's proposed material fact and present separate, additional facts risk the possibility that the Court will consider defendant's proposed fact as undisputed.").

## LEGAL STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In resolving a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In order to withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If the evidence, however, is "merely colorable, or is not significantly probative" or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, in order to overcome the undisputed facts set forth in a defendant's motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions or other evidence of an admissible sort that a genuine dispute of material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

**DISCUSSION**

**The Relief Requested by the Parties**

In Twin City's Complaint, it asks the Court for a declaration that it does not owe Alcast, Holt, and Wessels any duty to defend or indemnify in connection with the *Pacific Steel* adversary proceeding. Doc. 1. at 1. However, in its Motion for Partial Summary Judgment, Twin City requests the Court enter partial summary judgment in Twin City's favor by declaring the limit of Twin City's obligation to pay defense costs, if any, is 7.295% of the reasonable Jenner invoices. Doc. 63 at 15. Alcast seeks a declaration that Twin City must defend Alcast in the *Pacific Steel* litigation and allocate all defense costs incurred on behalf of Alcast to a covered loss. Doc. 71 at 24. Alternatively, Alcast seeks a declaration that Twin City is obligated to pay 80.89% of Alcast's defense costs. *Id*.

**The Parties' Arguments**

Twin City presents three main arguments in support of its Motion. First, it asserts Alcast seeks to "double dip" by seeking 100% of defense costs from both Twin City and CNA. Doc. 63 at 7. Second, Twin City asserts its policy mandates allocation of defense costs and argues any defense costs incurred on behalf of the 12 non-insureds represented by Jenner are not covered losses. *Id*. at 8–9. Twin City goes on to argue the proper allocation of defense costs is based on the relative legal exposure of the parties, which it calculates as 7.295% for Alcast. *Id*. at 11–15.

In Alcast's Response and Request for Summary Judgment, it argues first that Twin City has a duty to defend Alcast in the *Pacific Steel* litigation because that litigation raises covered claims and Twin City expressly agreed to defend Alcast in the *Pacific Steel* litigation. Doc. 71 at 11–15. Second, it argues Twin City must pay 100% of Alcast's defense costs, even if fees incurred on behalf of Alcast also benefit Alcast's codefendants. *Id*. at 15. In making this

8

argument, Alcast disclaims reliance on the "reasonably related" doctrine. *Id*. at 19. Next, Alcast responds to Twin City's "double dipping" argument by noting that neither party is seeking monetary damages, and Alcast is not seeking to recover defense costs already paid by another insurer. *Id.* at 22–23. Finally, Alcast argues in the alternative that if defense costs must be allocated based upon the relative legal exposure of the parties, the correct distribution would be for Twin City to cover 80.89% of Alcast's defense costs rather than Twin City's proposal of 7.295%. *Id*. at 23–24.

**The Law Governing Insurance Agreements**

Under Illinois law, "the interpretation of an insurance policy and the respective rights and obligations of the insurer and the insured [are] questions of law that the court may resolve summarily." *Roman Catholic Diocese of Springfield in Ill. v. Md. Cas. Co.*, 139 F.3d 561, 565 (7th Cir. 1998). "Insurance contracts are interpreted to effectuate the intent of the parties as expressed through the contract language." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010). "The general rule for insurance policies calls for liberal interpretation in favor of coverage, but 'this rule of construction only comes into play when the policy is ambiguous.' " *Miller v. St. Paul Mercury Ins. Co.*, 683 F.3d 871, 874 (7th Cir. 2012) (quoting *Hobbs v. Hartford Ins. Co. of the Midwest*, 214 Ill.2d 11 (2005)).

**Twin City's Double Recovery Argument**

Twin City first argues Alcast seeks to "double dip" by seeking 100% of defense costs from both Twin City and CNA. Doc. 63 at 7. Whether CNA might independently be liable for defense costs of another party to the *Pacific Steel* litigation is irrelevant. What CNA chooses to pay or is obligated to pay its insured has no bearing on whether Twin City's policy requires it to pay defense costs for its own insured. If Twin City believes another insurer or party to the *Pacific*

*Steel* litigation must pay for a portion of defense costs or other loss, it is free to pursue

contribution claims against them. *Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955, 962 (7th

Cir. 1995) ("Our decision does not leave Great American 'without recourse' against uninsured

persons who participated in the alleged wrongful conduct but whose actions did not make the

settlement larger. The insurer, as subrogee of the directors and officers under Section VIII.E of

the policy, may still pursue contribution claims against those other persons.") (citations omitted).

**The Policy Requires Allocation of Defense Costs**

Twin City's next argument fares better, but at bottom Alcast does not really disagree that

defense costs should be allocated, it just thinks the allocation should be 100%. The issue of

allocation arises more frequently in the context of indemnification rather than costs associated

with the duty to defend, but case law addressing allocation in the indemnification context is

nonetheless helpful in deciding how Illinois law would address the issue of allocating defense

costs. For example, if Twin City's Policy were silent on the issue of allocation, courts applying

Illinois law would likely favor the "larger settlement" rule over the "relative exposure" rule. *See*

*Caterpillar*, 62 F.3d at 962 (adopting "larger settlement" rule where policy is silent on method of

apportioning loss). But in this case Twin City explicitly provided for the method of allocating

defense costs where some of those costs are incurred by non-insureds. *Id*. (noting Illinois

disfavors *pro rata* allocation *absent language in the insurance contract that so requires*).

Specifically, Twin City's Policy provides:

> Solely with respect to all Liability Coverage Parts:
>
> Where Insureds who are afforded coverage for a Claim incur an amount consisting
> of both Loss that is covered by this Policy and also loss that is not covered by this
> Policy such Claim includes both covered and uncovered matters, then coverage
> shall apply as follows:
>
> (A) with respect to a covered Claim for which the Insurer has the duty to defend:

(1) 100% of the Insured's Defense Costs shall be allocated to covered Loss; and

(2) All other Loss shall be allocated between covered Loss and non-covered loss based upon the relative legal exposure of all parties to such matters.

(B) with respect to a covered Claim for which the Insurer does not have the duty to defend, all Loss shall be allocated between covered Loss and non-covered loss based upon the relative legal exposure of the parties to all such matters.

Doc. 63 at 4; Doc. 77 at 4.

Based on the above allocation provision, Twin City quite reasonably argues that any defense costs incurred on behalf of the 12 non-covered defendants represented by Jenner are not covered under the Policy's definition of defense costs and the Policy thus requires an allocation. Doc. 63 at 9. The real dispute in this litigation is what that allocation looks like. Alcast succinctly frames the issue in its Response:

In the Pacific Steel litigation, Alcast and several other defendants are jointly represented by Jenner & Block. Due to the joint representation, Jenner & Block's legal services fall within three categories: (1) fees incurred by Alcast alone; (2) fees incurred jointly by Alcast and one or more of Alcast's co-defendants; and (3) fees incurred only by one or more of Alcast's co-defendants. Applying the Policy's definition of "Defense Costs," Twin City must pay for Jenner & Block's services that benefit Alcast alone because they are "legal fees and expenses incurred in the defense" of the underlying litigation. Twin City concedes this. Conversely, Twin City does not have to pay for Jenner & Block's services that only benefit one of Alcast's co-defendants because that constitutes "fees, expenses or costs which are incurred by or on behalf of a party which is not a covered Insured(.)" Alcast and Twin City dispute whether Twin City must pay 100% of the "Defense Costs" incurred on behalf of Alcast when those fees also benefit Alcast's codefendants.

Doc. 71 at 17 (cleaned up). However, the problem for Alcast is that, at least in this Circuit, courts do not apply the "reasonably related" test to require insurers to pay defense costs for non-insureds whose defense may nevertheless benefit the insured. *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 354 (7th Cir. 2010) ("None of these cases allows us to predict that the Illinois Supreme Court would require an insurer to reimburse the defense costs of

11

all parties whose defense may have benefitted an insured, given the contract provisions at issue

here. The plaintiffs' 'reasonably related' rule would swallow the contract provisions limiting St.

Paul's liability to its insureds' contract indemnitees."). This is so even where the non-insured's

liability is largely or entirely derivative of the insured's own liability. *Id*. at 353. And while most

of the case law cited by the parties and researched by the Court focuses on allocation in the

context of indemnity, the Seventh Circuit has on at least one occasion determined that allocation

should be applied to defense costs in the same manner as indemnity costs. *Miller v. St. Paul*

*Mercury Ins. Co.*, 683 F.3d 871, 880 (7th Cir. 2012) ("In their briefs, the plaintiffs argued that the

duty to defend requires St. Paul to cover all defense costs, even that portion attributable to the

defense of otherwise uncovered claims brought by insured plaintiffs. At oral argument, however,

plaintiffs' counsel conceded that the allocation clause should be applied to defense costs in the

same manner as indemnity costs, thereby removing from coverage those defense costs brought

by or on behalf of insured plaintiffs. We agree and hold that St. Paul has a duty to defend against

only the claims of non-insured plaintiffs."); *see also Vita Food Prod., Inc. v. Navigators Ins. Co.*,

No. 16 C 08210, 2017 WL 2404981, at *8 (N.D. Ill. June 2, 2017) (noting this method

"minimizes the risk of arbitrary results and discourages efforts to manipulate the result by the

ways in which individual claims happen to be combined or separated").

**Alcast's Relative Legal Exposure**

Having determined that Jenner's bill for defense costs must be allocated, the Court must

next determine what that allocation looks like. The Policy says the costs must be allocated based

on the "relative legal exposure of all parties." As the insured, Alcast bears the burden of

establishing its loss falls within the terms of the Policy. *St. Michael's Orthodox Cath. Church v.*

*Preferred Risk Mut. Ins. Co.*, 146 Ill. App. 3d 107, 111 (1986) ("The burden rests upon the

insured to prove that his loss resulted from a peril insured against. Where part of a loss resulted from a peril insured against and part from a peril not covered by insurance, the insured must show the amount of the loss that is covered by his policy."). In its Motion, Twin City asserts that Alcast's potential exposure in the *Pacific Steel* litigation is $3,964,968, while the total damages sought against all defendants is $54,348,177, or 7.295%. Doc. 63 at 16.

In its Response, Alcast takes the untenable position that *all* of the fees which Alcast has sought or will seek reimbursement from Twin City were incurred on Alcast's behalf. Doc. 71 at 18. If that were truly the case, 12 of the *Pacific Steel* defendants would be in default. Alcast also argues that

> [a]ny other interpretation would render Paragraph (A)(1) of the Policy's allocation provision, and the words "All other" in Paragraph (A)(2), nugatory because "Defense Costs" in cases with multiple defendants who are represented by the same legal counsel would then be allocated "based upon the relative legal exposure *of all parties* to such matters," and not just jointly represented parties.

Doc. 71 at 18. However, Alcast does not explain why the possibility of joint representation would render section (A) of the Policy null. While Alcast might have convincing policy arguments favoring allocation among only jointly represented parties, the Policy clearly and unequivocally provides that allocation is based on the relative legal exposure of *all parties to such matters*. Section (A) of the Policy is not frustrated simply because an insured agrees to joint representation with non-insureds. As Twin City points out, costs and expenses incurred solely on behalf of the 12 non-insureds are necessarily excluded because the 12 defendants are not "Insureds" and their expenses are not "Defense Costs." Doc. 77 at 8. Moreover, section (A) can also be read in harmony with section (B). Where there is a covered claim for which Twin City has the duty to defend, section (A) requires allocation but ensures that the insured's *own* defense costs will be completely covered but limits costs not solely attributable to the insured's defense

13

by requiring apportionment based on the relative legal exposure of the parties. Section (B), in contrast, anticipates a scenario where Twin City does not have a duty to defend but may nevertheless be liable for indemnification. In that scenario, the insured's liability is subject to allocation.

Applying the Policy as written to the three categories of costs delineated by Alcast, section (A)(1) of the Policy requires Twin City to reimburse 100% of the fees incurred by Alcast *alone*.[4] Section (A)(2) requires fees incurred jointly by Alcast and one or more of Alcast's co-defendants to be apportioned based upon the relative legal exposure of all "parties to such matters."[5] Finally, for the category of fees incurred only by one or more of Alcast's co-defendants, Twin City owes nothing.[6] *See* Doc. 71 at 17 ("Due to the joint representation, Jenner & Block's legal services fall within three categories: (1) fees incurred by Alcast alone; (2) fees incurred jointly by Alcast and one or more of Alcast's co-defendants; and (3) fees incurred only by one or more of Alcast's co-defendants."). In short, the allocation provision of the Policy is not rendered ambiguous or contradictory simply because Jenner jointly represents both insured and uninsured defendants in the *Pacific Steel* litigation.[7]

Alcast's better argument concedes apportionment is required but asserts its relative legal exposure is much greater than Twin City suggests. While Twin City asserts that Alcast's potential exposure in the *Pacific Steel* litigation is $3,964,968 and the total damages sought against all

---

[4] The parties do not presently ask the Court to determine the actual amount of Alcast's own defense costs.

[5] The Court notes Twin City's allocation provision is more generous to Alcast than what Illinois law would otherwise require. *See Marquis Energy LLC v. Fed. Ins. Co.*, No. 19-CV-1089-JES-JEH, 2020 WL 853503, at *3 (C.D. Ill. Feb. 20, 2020) ("Under Illinois law, insurers are not required to fund litigation costs of uninsureds, regardless of whether the uninsured's claim or defense may have benefited an insured.").

[6] For example, Twin City has no obligation to pay Jenner's invoices for the motion to dismiss filed solely on behalf of the uninsureds. *See* Doc. 77 at 27–28.

[7] This conclusion does not foreclose Alcast from arguing that "all parties to such matters" comprises a smaller subset of individuals than all defendants to the *Pacific Steel* litigation, but Alcast does not appear to advance this argument currently.

defendants is $54,348,177 (7.295%), Alcast points out that the Trustee's FAC adds a 14th claim against the "Owner Defendants"—Alcast included—for $40,000,000. Doc. 71 at 23–24. Thus, Alcast alternatively argues for an allocation of 80.89%, representing $43,964,968 in Alcast's potential damages out of a total of $54,348,177. In its Reply, Twin City adjusts its position and its math again, asserting that the $40 million should be divided by 14, for each defendant, and the $40 million should be multiplied by 14 for calculating the total exposure. Doc. 77 at 23–26 (now suggesting Alcast's potential exposure is $43.9 million out of $574.3 million, or 7.63%).

A discrepancy of $40 million is a big one; the difference between $54 million and $574 million is even bigger. How the 14th claim for relief in the *Pacific Steel* litigation affects Alcast's relative legal exposure, and in turn Twin City's duty to cover defense costs, is a significant and important issue in this litigation. Yet Twin City addresses this issue only in passing, presenting an underdeveloped argument that the $40 million claim is "contingent" and is a "secondary liability" provision only. Doc. 77 at 11. In essence, Twin City argues Alcast can only be liable for the 14th claim if the Management Defendants are also liable. *Id.* at 12. The Court is skeptical of Twin City's argument in this regard. After all, the allocation provision of the Policy is prospective in nature—it focuses on the relative legal *exposure*, suggesting the analysis is one of possibilities rather than firmly established costs and liabilities as determined after a final judgment. Thus, it is plausible that Alcast could be found solely liable on the Trustee's 14th claim for relief and be responsible for the entirety of the $40 million.

On the other hand, on this exceptionally important issue, Alcast has inexplicably failed to file a Reply addressing the arguments set forth by Twin City in its combined Response and Reply. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the waiver] rule where a party fails to develop arguments related to a discrete issue, and we also apply that

rule where a litigant effectively abandons the litigation by not responding to alleged deficiencies in a [dispositive] motion."). Twin City also muddies the waters by taking vacillating positions both within and between its briefs. *See, e.g.,* Doc. 77 at 20 (in which Twin City now appears to argue it is not responsible for *any* defense costs); *cf.* Doc. 63 at 15 (advocating for a 7.295% allocation); *see also* Doc. 77 at 23 (asserting questions of fact prevent the Court from determining how to allocate the Jenner invoices).

In addition to its specious argument that the Court should rule in Twin City's favor because another court *might* decide another insurer is responsible for some or all of Jenner's invoices (Doc. 77 at 21), Twin City also argues for the first time in its combined Response and Reply that the contract exclusion in the Policy serves to absolve Twin City of any duty to defend or indemnify Alcast in the *Pacific Steel* litigation. *Id.* at 28. Although Alcast admittedly failed to respond to this argument, summary judgment is proper only where there are no genuine disputes of material fact *and* the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Here, in addition to the myriad factual disputes as to which portions of the Jenner invoices are attributable to each of the jointly represented defendants in the *Pacific Steel* litigation, the issue of the contract exclusion has not been sufficiently addressed by the parties such that the Court can resolve the issue on the present record.

For the reasons set forth above, neither Twin City nor Alcast is entitled to summary judgment on the present record. Factual disputes regarding the Jenner invoices pervade this entire litigation, and the Court therefore declines to assign any definite allocation percentage at this juncture. Given the existence of these factual disputes, Alcast's Motion for Judgment on the Pleadings must necessarily be denied as well. Simply put, the Court cannot decide the issues presented by the parties without a more developed record. Twin City is entitled to summary

judgment as to Holt and Wessels because it is uncontested that they are not insureds under Twin City's Policy. Finally, given the issues identified herein, and operating under the assumption that both parties wish to arrive at a resolution of this matter, the Court believes the parties may be best served by attempting to settle their dispute with the assistance of a neutral mediator. If the parties believe settlement discussions may be productive, the Magistrate Judge remains available to assist the parties in resolving their dispute. *See* CDIL L.R. 16.1(B).

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion (Doc. 63) is denied and Defendant's Request for Summary Judgment is denied. Defendant's Motion for Leave to File Under Seal (Doc. 68) is granted. Defendant's Motion for Judgment on the Pleadings (Doc. 47) is denied. Twin City's Unopposed Motion (Doc. 64) for Partial Summary Judgment as to Holt and Wessels is granted.

Signed on this 13th day of December, 2021.

s/ James E. Shadid
James E. Shadid
United States District Judge